UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:

PONDEROSA-STATE ENERGY, LLC          Case No. 19-13011(___)

    Debtor.                                                Chapter 11

------------------------------------------------------------x

# DECLARATION OF RICHARD SANDS
# UNDER LOCAL RULE 1007-2 AND LOCAL RULE 9077-1
# IN SUPPORT OF CERTAIN "FIRST DAY" MOTIONS

      I, RICHARD SANDS, declare pursuant to 28 U.S.C. § 1746 as follows:[1]

      1.        On September 18, 2019 (the "Petition Date"), Ponderosa-State Energy, LLC, the above-captioned debtor (the "Debtor"), filed a voluntary petition for relief under chapter 11, title 11, United States Code (the "Bankruptcy Code") in this Court.

      2.        I am the manager of the Debtor. I have been the manager of the Debtor since it was organized on December 16, 2016. As the Manager, I make all major business decisions on behalf of the Debtor.[2]

      3.        My wife and I are the only members of the Debtor's sole member, RNP, LLC.

      4.        The Debtor is an oil and gas exploration and production company. The Debtor's principal asset is an oil and gas lease with the State of Texas (the "Amended State Lease").[3]

      5.        The Debtor is a Delaware limited liability company that was organized on December 16, 2016 and commenced operations on January 1, 2017.

---

[1]     This affidavit addresses the information requests set forth in Local Rule 1007-2. To the extent there is no information responsive to a particular sub-part of Local Rule 1007-2, then there is either no responsive information or the particular subsection is not applicable.

[2]     This paragraph responds to the information requested in Local Rule 1007-2(a)(12).

[3]     This responds to the information requested in Local Bankruptcy Rule 1007-2(a)(10).

6.	The Debtor's management team, mailing address, and books and records are located at 745 Fifth Avenue, Suite 537, New York, New York 10151.[4]

**Reason for Bankruptcy Filing**[5]

7.	As set forth below in greater detail, the Debtor commenced this chapter 11 case to force a resolution of a dispute involving the Amended State Lease. Because of this ongoing dispute, a substantial portion of the Debtor's revenue are being placed in disputed reserve accounts. Reimbursements from these disputed reserve accounts have been insufficient and untimely to continue operations of Company's properties. This ongoing dispute creates uncertainty with respect to the Debtor's interest in the Amended State Lease, as such the Debtor is unable to attract sufficient capital to invest in capital expenses and crucial workovers to maintain current production. As a result, the Debtor has only seven of its 65 wells producing. When a well falls into disrepair, the Debtor is unable to get funds from the disputed reserve accounts to restore production. The Debtor intends to borrow money as a debtor-in-possession and use some of the proceeds to increase the number of producing wells which in turn will increase its revenue and profits.

8.	I believe if the dispute involving the Amended State Lease is resolved, the Debtor would be able to attract more capital investment in workovers and further increase the number of producing wells. I believe that resolving the dispute involving the Amended State Lease will substantially enhance the value of the Debtor's property and its ability to repay its liabilities in full. In particular, if the dispute is resolved, the funds generated from the Debtor's properties

---

[4]    This responds to the information requested in Local Bankruptcy Rule 1007-2(a)(9), (10).

[5]    This section responds to a portion of Local Rule 1007-2(a)(1) that states that the affidavit must set forth "concise statement of the circumstances leading to the debtor's filing under chapter 11 [.]"

could be used to efficiently maintain and grow the production of the leases thereby increasing the Debtor's ability to repay outstanding liabilities.

9. The Debtor is caught in the middle of a dispute between the TX Plaintiffs and the State of Texas as Lessor. Over four years have elapsed and the State Court is still adjudicating the issue of potential sovereign immunity of the State of Texas not the merits of the claim to title. The resolution of that dispute has no end in sight and has crippled the Debtor's ability during this time to operate its properties through disputed title claims and suspension of proceeds from operations. If the merits of the case could be heard then the Debtor's title with the State of Texas as Lessor would have, in my opinion, been validated and the Debtor's ability to service its obligations restored.

10. If the dispute is resolved, then the Debtor's properties would likely have substantial value exceeding its outstanding liabilities. The suspension of net proceeds has impeded the Debtor's ability to operate the properties and therefore has led to the decline in the value of the properties. I believe that this chapter 11 process will give the Debtor a path to resume operations uninterrupted and restore the value of its property.

**Nature of the Debtor's Business**[6]

11. As noted above, the Debtor is an oil and gas exploration and production company.

12. Ponderosa TX Operating LLC ("Ponderosa TX Operating"), an affiliate of the Debtor, is the operator of record for the Debtor's oil and gas properties. Ponderosa TX Operating also provides managerial, technical, professional and administrative services to the Debtor.

---

[6] This section responds to a portion of Local Rule 1007-2(a)(1) that states that the affidavit must set forth "the nature of the debtor's business[.]"

13. The Debtor does not have any of its own employees.[7] Rather, it relies on the employees of its affiliates for all managerial, technical, professional, operational and other administrative services.

14. During the first 30 days of the bankruptcy case, I expect the Debtor's business to do the following: [8]

- Make approximately $40,000 in revenue from operations (such amount to be divided among the Debtor and the disputed reserve accounts);

- Use approximately $88,000 in expenses (not including the chapter 11 expenses), including $50,000 for capital expenditures for well workovers to restore production from inactive wells.

**The State Court Lawsuit[9]**

15. The Amended State Lease stems from the Canadian River Mineral Boundary Agreement (the "CRMBA"). The CRMBA is effective January 1, 2002. It was entered into by and among the Debtor (as successor to J.M. Huber Corporation), Jaten Oil Company ("Jaten"), Riparia, LC ("Riparia"), the State of Texas, and other mineral owners adjacent to the Canadian River who elected to be subject to the CRMBA. The CRMBA is recorded in the Official Public Records of Hutchinson County, Texas at Vol 1236, Page 35 et seq.

16. By way of background, the State of Texas is the owner of the oil, gas, and mineral rights in the riverbed of the Canadian River. The construction of the Sanford Dam on the Canadian River impeded the flow of the water of the Canadian River to the east of the dam. As a result, the State of Texas and the mineral owners adjacent to the Canadian River had disputes regarding the boundary of the Canadian River. The CRMBA resolves those disputes. The parties to the CRMBA

---

[7]  This responds to the information requested in Local Bankruptcy Rule 1007-2(b)(1).
[8]  This paragraph responds to the information requested in Local Bankruptcy Rule 1007-2(b)(3).
[9]  This section responds to the information requested in Local Bankruptcy Rule 1007-2(a)(7).

4

agreed to the location of the riverbed of the Canadian River (the "Agreed Riverbed") in which the State of Texas owns oil, gas, and mineral interests. The parties to the CRMBA also agreed not to challenge the Amended State Lease, an agreement which the TX Plaintiffs (defined below) clearly breached with in connection with the State Court Lawsuit (defined below).

17. The Debtor is one of several defendants in an ongoing lawsuit filed June 23, 2015 by Signal Drilling, LLC (the "Signal Drilling"), Jaten as an involuntary plaintiff, and Riparia (Signal Drilling, Jaten, and Riparia, collectively as the "TX Plaintiffs") as an intervenor in the Supreme Court of Texas, Hutchinson County (the "State Court"), Case No.41971 (the "State Court Lawsuit").

18. In the State Court Lawsuit, the TX Plaintiffs allege that the Amended State Lease terminated in 2012 and, therefore, the Debtor is not a lessee, and is liable for trespass, conversion, and that the TX Plaintiffs are entitled to an accounting and restitution.

19. The TX Plaintiffs argue that as a result of the termination of the Amended State Lease (before it was assigned to the Debtor as lessee), certain provisions of the CRMBA were triggered which gives the riparian owners (including the TX Plaintiffs), the oil, gas, and mineral interests previously owned by the State of Texas in the Agreed Riverbed, and that the only remaining interest held by the State of Texas is a 3.5% non-participating royalty interest. Accordingly, the TX Plaintiffs argue, the State of Texas is liable for a constitutional taking, because in 2015, the State of Texas, as lessor, entered into a renewal of the Amended State Lease after its alleged termination.

20. Although several years have passed since the State Court Lawsuit was commenced, the State Court has not heard any substantive matters concerning the interpretation of the CRMBA, leaving the parties in limbo and the Debtor unable to maximize the value of its property. It does

not appear that the State Court Lawsuit will progress anytime in the near future, because the State Court Lawsuit is stayed while an appeal by the State of Texas is considered relating to whether or not the State of Texas has governmental immunity from the claims raised in the State Court Lawsuit.

**Appointment of the Special Master and the Disputed Reserve Accounts[10]**

21.     As part of the State Court Lawsuit, the State Court found that ownership of the proceeds from the sale of the oil, gas, and minerals produced (previously and in the future) from the Agreed Riverbed by the Debtor are disputed and will be in danger of being lost or depleted during the pendency of the State Court Lawsuit.

22.     Accordingly, on October 6, 2017, the State Court entered an Order appointing Kent Reis as a "Master" (the "Special Master") pursuant to Texas Rule of Civil Procedure 171, for the limited purpose of calculating the monthly reasonable and necessary operating costs of the oil and gas wells located in the Agreed Riverbed which are incurred by the Debtor from and after September 1, 2017, based upon data to be provided by the Debtor.

23.     The State Court also ordered that during the pendency of the State Court Lawsuit: (i) the Debtor deposit 21.5% of the "Net Proceeds"[11] into an interest-bearing account to be maintained in the Borger Branch of Amarillo National Bank (the "Royalty Account") and that funds may not be withdrawn without prior written order of the State Court; and (ii) the Debtor open a second interest-bearing bank account (the "Disputed Working Interest Account") and

---

[10]     This information in this section responds to Local Bankruptcy Rule 1007-2(a)(8).

[11]     "Net Proceeds" are defined in the Order as all of the gross proceeds from the sale of "oil, gas, condensate and other hydrocarbon liquids" produced from the Agreed Riverbed, less severance taxes pertaining to those gross proceeds.

6

deposit 36.75% (being 49% of 75%) of the "Net Proceeds." The State Court ordered the balance to be paid to the Debtor.

24. Unlike the Royalty Account, the Debtor is permitted to withdraw from the Disputed Working Interest Account 49% of the reasonable and necessary "Operating Costs"[12] of the oil and gas wells located in the Agreed Riverbed, incurred on and after September 1, 2017.

25. The Special Master is tasked with calculating the reasonable and necessary Operating Costs of the oil and gas wells located in the Agreed Riverbed, incurred by the Debtor from and after September 1, 2017, but does not timely turnover necessary funds, or accounting information requested by the Debtor. The Special Master capriciously determines which expenses to reimburse.

26. The Special Master (and his consultants) are compensated based upon reasonable and necessary charges, with 51% paid by the Debtor, and 49% paid by the TX Plaintiffs.

27. On March 28, 2018, the State Court entered an Order providing the Special Master sole control over the Royalty Account and the Disputed Working Interest Account. Pursuant to that Order, the State Court directed the Debtor to cause the purchasers of oil, gas, condensate, and liquid hydrocarbons from the Agreed Riverbed to deposit 36.75% of the proceeds directly into the Disputed Working Interest Account, and 21.5% of the proceeds directly into the Royalty Account. The State Court, by that Order, also authorized the Special Master to determine and pay the Debtor from the Disputed Working Interest Account, without prior order from the State Court: (i) 49% of the "reasonable and necessary" (as determined solely by the Special Master) monthly operating

---

[12] "Operating Costs" are defined to include "the reasonable and necessary costs incurred by [the Debtor] to produce and maintain existing wells, but shall not include the cost of drilling, completing equipping a well." In addition, "Operating Costs" include ad valorem taxes assessed against any producing well in the Agreed Riverbed, and to the extent assessed against a royalty interest, 49% of those are to be paid from the Royalty Account (*i.e.,* 51% of those are to be paid by the Debtor).

7

costs; and (ii) 36.75% of the monthly severance taxes; and from the Royalty Account, without prior order from the State Court, 21.5% of the monthly severance taxes from the Royalty Account.

**The Debtor's Assets**[13]

28. As noted above, the Debtor's principal asset is its interest in the Amended State Lease. The Debtor's other assets include oil and gas inventory, cash deposited in its prepetition bank accounts and other assets described in more detail on the Debtor's Schedules of Assets and Liabilities.

**The Debtor's Liabilities**[14]

29. The Debtor's liabilities include a secured loan to Washington Federal, an unsecured loan to RNP, LLC and various trade credit.

**Washington Federal Secured Loan**[15]

30. In July 2017, the Debtor petitioned the State Court for authority to obtain a secured loan from Washington Federal, National Association ("Washington Federal"). On July 17, 2017, the State Court entered an Order approving the Debtor's request to obtain a loan from Washington Federal, stating that such loan shall not adversely affect or attach to any interest that any of the TX Plaintiffs may own or be entitled to, upon a final judgment, and limiting the Debtor's use of the loan proceeds to developing and maintaining the leases which are the subject of the State Court Lawsuit.

31. Effective July 13, 2017, the Debtor entered into a credit agreement (the "Prepetition Credit Facility") with Washington Federal, subject to approval by the State Court, which was obtained, for a secured revolving line of credit (the "Revolver Loan") which matures July 13, 2020.

---

[13] The information in this section responds to Local Bankruptcy Rule 1007-2(a)(6).
[14] This information in this section responds to Local Bankruptcy Rule 1007-2(a)(6).
[15] This information in this section responds to Local Bankruptcy Rule 1007-2(a)(5).

The total revolving line of credit is $5,000,000. The Debtor does not have access to the full $5,000,000 until there is resolution of the dispute regarding the Amended State Lease. As of the Petition Date, the Debtor has an outstanding principal balance on the Prepetition Credit Facility in the amount of approximately $680,000.00.

32.    Other than the Prepetition Credit Facility with Washington Federal, the Debtor does not have any other secured creditors.

**RNP Unsecured Loan**

33.    RNP has loaned the Debtor money on an unsecured basis. As a result of the ongoing State Court Lawsuit, the appointment of the Special Master, and the related funding delays, the Debtor has not had access to sufficient funding from net proceeds to cover all its operating expenses. RNP loans the Debtor funds to meet these crucial operating expenses. As of the Petition Date, the outstanding amount owed to RNP is $242,500 plus interest.

**Trade Credit**

34.    Details of the Debtor's largest unsecured creditors including the Debtor's trade are set forth on the *List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* filed in connection with this affidavit and the Debtor's petition.[16]

**First Day Motions**

35.    In connection with its efforts to reorganize pursuant to chapter 11 of the Bankruptcy Code, the Debtor seeking approval of certain emergency requests contained in the following "First Day" motions:

- *Motion Pursuant to 11 U.S.C. §§ 361 and 363(c) For Order Authorizing Use of Cash Collateral* (the "Cash Collateral Motion");

---

[16]    This information is provided in response to Local Bankruptcy Rule 1007-2(a)(4).

- *Motion Pursuant To 11 U.S.C. § 364 For Order Authorizing Debtor To Obtain Credit* (the "DIP Financing Motion"); and

- *Motion For (I) Entry of an Interim Order Authorizing Debtor To Use Existing Cash Management System and (II) Entry of a Final Order Authorizing Debtor Use Modified Cash Management System* ("Cash Management Motion").

**Cash Collateral Motion**

36. Washington Federal has a first-priority lien on substantially all, if not all, the Debtor's assets, including the Debtor's cash and inventory. Without the use of cash, the Debtor cannot pay essential operating expenses. Washington Federal has agreed to permit the Debtor to continue to use its cash collateral during this chapter 11 case so long as the Debtor continues to pay its regular monthly installments of principal and interest. Pays other fees and cost as they arise in the ordinary course.

**DIP Financing Motion**

37. Postpetition financing is essential to the Debtor's ability to invest in capital expenses for workovers to increase the number of producing wells and in turn increase revenue. It is also critical to fund the costs of the Debtor's professionals and other costs related to the administration of the chapter 11 case.

38. The proposed "DIP Lender" is RNP, the sole member of the Debtor. My wife and I own RNP. RNP and the Debtor are represented by different counsel.

39. RNP has offered to make a postpetition secured loan to the Debtor up to $100,000 on an interim basis plus an additional $200,000 on a final basis plus an additional $200,000 if requested by the Debtor and approved by the DIP Lender. The borrowed funds are to be used for the purpose of funding costs in connection with a proposed 13-week budget (the "Budget"). These costs include capital expenses for workovers, payment of chapter 11 professional fees and other costs for the administration of the Debtor's chapter 11 case.

10

40. On information and belief, the Debtor cannot find unsecured credit to fund the Debtor on a postpetition basis other than RNP.

41. The Debtor has an immediate need to access the funds provided by RNP. The Debtor cannot maintain the value of its property during the pendency of its chapter 11 case without access to cash as set forth in the Budget and therefore the Debtor's estate would suffer immediate and irreparable harm to the detriment of all creditors and other parties-in-interest without access to funds.

42. Following the 13-week budget and based in part on the capital expenditures including the 13-week budget, the Debtor should generate enough cash flows to pay its operating costs and the costs to administer the chapter 11 cases. If there is a cash shortfall, I will likely cause RNP to provide the Debtor additional postpetition financing.

43. I believe that the proposed postpetition financing will significantly increase the Debtor's ability to generate revenue at a profit, essential to the Debtor's successful emergence from chapter 11.

**Cash Management Motion**

44. The motion seeking authority to continue using the Debtor's prepetition cash management system on a temporary basis is critical to ensure the there are few disruptions with the Debtor's business as it transitions into chapter 11.

45. The Debtor intends to use this temporary period to close all the Debtor's existing bank accounts and open new accounts that include the "Debtor in Possession" designation on them. The Debtor intends to establish a cash management system that parallels the cash management system the Debtor had on the Petition Date. Specifically, the Debtor intends to continue to maintain a royalty account and a disputed working interest reserve account until this Court resolves

11

the dispute regarding the Amended State Lease and directs the distribution of the funds in the royalty reserve and the disputing working interest reserve accounts.

## CONCLUSION

46. I believe that under the protection of this Court, the Debtor will be able to maximize the value of its business and assets for the benefit of creditors and other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 18, 2019

_____
Richard Sands