DIAMOND McCARTHY LLP
Charles M. Rubio
Sheryl P. Giugliano
295 Madison Ave, 27th Floor
New York, NY 10017
Tel: (212) 430-5400
crubio@diamondmccarthy.com
sgiugliano@diamondmccarthy.com

*Proposed Counsel to Ponderosa-State Energy, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:

PONDEROSA-STATE ENERGY, LLC,          Case No. 19-13011(JLG)

    Debtor.                                               Chapter 11
--------------------------------------------------------x

## MOTION PURSUANT TO 11 U.S.C. § 364 FOR ORDER AUTHORIZING DEBTOR TO OBTAIN CREDIT

Ponderosa-State Energy, LLC, as debtor and debtor in possession (the "Debtor") files this *Motion Pursuant To 11 U.S.C. § 364 For Order Authorizing Debtor To Obtain Credit* (the "Motion") and with the support of the *Declaration of Richard Sands*, dated September 18, 2019 [ECF 2] (the "Sands Declaration")[1] respectfully states as follows:

### JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are section 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code"), rule 4001

---

[1] The Sands Declaration includes the information to support interim emergency relief in accordance with Local Rule 9077-1.

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## BACKGROUND

4. On September 18, 2019 (the "Petition Date"), the Debtor commenced a case (the "Chapter 11 Case") under chapter 11 of the Bankruptcy Code, in this Court.

5. The Debtor is an oil and gas production company. The Debtor's principal asset is its interest in an oil and gas lease (the "Amended State Lease") with the state of Texas that covers a portion of the riverbed of the Canadian River in Hutchinson County, Texas.

6. The Debtor's principal place of business is 745 Fifth Avenue, Suite 537, New York, New York 10151.

7. Ponderosa TX Operating LLC ("Ponderosa TX Operating") is an affiliate of the Debtor. Ponderosa TX Operating is the operator of the Debtor's oil and gas properties and provides managerial, technical, professional and administrative services to the Debtor.

8. The Debtor remains in possession of its property and management of its affairs pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9. To date, no committee, trustee, or examiner has been appointed in this case.

**A.    The Texas State Court Lawsuit**

10. The Debtor is a party to the Canadian River Mineral Boundary Agreement (the "CRMBA"). The CRMBA established the location of the riverbed of the Canadian River (the "Agreed Riverbed") in which the State of Texas owns oil, gas and mineral interests. Pursuant to the Amended State Lease and related assignment documents, Ponderosa is the successor-in-interest to the lessee of these oil, gas and mineral interests.

11.     The Debtor is a defendant in a lawsuit styled *Signal Drilling, et al v. New-Tex Operating, et al.*, cause number 41,971 (the "State Court Lawsuit") pending in the 84th Judicial District Court of Hutchinson County, Texas (the "State Court").

12.     The plaintiffs in the State Court Lawsuit (the "TX Plaintiffs") contend that the Amended State Lease terminated in 2012.  The TX Plaintiffs argue that as a result of this alleged termination, certain provisions in the CRMBA were invoked that give the mineral owners adjacent to the Agreed Riverbed, including the TX Plaintiffs, the oil, gas and mineral interests previously owned by the State of Texas in the Agreed Riverbed and the only remaining interest held by the State of Texas is a 3.5% non-participating royalty interest.

13.     In 2015, the State of Texas, as lessor, and the predecessor to Ponderosa, as lessee, entered into a renewal of the Amended State Lease.  The TX Plaintiffs argue that because the TX Plaintiffs are now the alleged owners of the oil, gas and mineral interests in the Agreed Riverbed, the renewal of the Amended State Lease constitutes a governmental taking by the State of Texas.

14.     The State Court has not heard any substantive matters concerning the interpretation of the CRMBA.   The State of Texas appealed a decision relating to whether the State of Texas has governmental immunity from the lawsuit.   The appeal has stayed the underlying proceedings in the State Court Lawsuit.

    B.     **The Royalty Account, the Disputed Working Interest Account and the Special Master**

15.     On October 6, 2017, the State Court entered an order (the "October 2017 Order") in which it found that the ownership of the proceeds from the sale of the oil, gas, and minerals produced by the Debtor from the Agreed Riverbed are disputed and are in danger of being lost or depleted during the pendency of the State Court Lawsuit.

16. Pursuant to the October 2017 Order, the State Court ordered that during the pendency of the State Court Lawsuit, the Debtor shall deposit 21.5% of the "Net Proceeds"[2] into an interest-bearing account (the "Prepetition Royalty Account").  The State Court ordered that no funds may be withdrawn from the Prepetition Royalty Account without prior written order of the State Court.

17. The Prepetition Royalty Account is a money market account ending in 7345 at Amarillo National Bank. The Prepetition Royalty Account is in the name of Ponderosa TX Operating. As of the Petition Date, there is approximately $500,000.00 in the Prepetition Royalty Account.

18. The State Court also ordered that during the pendency of the State Court Lawsuit, the Debtor open a second interest-bearing bank account (the "Prepetition Disputed Working Interest Account") and during the pendency of the State Court Lawsuit, deposit into that account 36.75% (being 49% of 75%) of the "Net Proceeds."  Unlike the Prepetition Royalty Account, the funds in the Prepetition Disputed Working Interest Account are to be used to pay 49% of the reasonable and necessary "Operating Costs"[3] of the oil and gas wells located in the Agreed Riverbed.

19. The Prepetition Disputed Working Interest Account is a money market account with an account number ending in 7353 at Amarillo National Bank.  The Prepetition Disputed

---

[2]    "Net Proceeds" are defined in the October 2017 Order as all of the gross proceeds from the sale of "oil, gas, condensate and other hydrocarbon liquids" produced from the Agreed Riverbed, less severance taxes pertaining to those gross proceeds.

[3]    "Operating Costs" are defined in the October 2017 Order to include "the reasonable and necessary costs incurred by [the Debtor] to produce and maintain existing wells, but shall not include the cost of drilling, completing equipping a well."  In addition, "Operating Costs" include ad valorem taxes assessed against any producing well in the Agreed Riverbed, and to the extent assessed against a royalty interest, 49% of those are to be paid from the Royalty Account (i.e., 51% of those are to be paid by the Debtor).

Working Interest Account is in the name of Ponderosa TX Operating. As of the Petition Date, there is approximately $275,000.00 in the Prepetition Disputed Working Interest Account.

20. Pursuant to the October 2017 Order, the State Court appointed Kent Reis as a "Master" (the "Special Master") pursuant to Texas Rule of Civil Procedure 171, for the purpose of calculating the monthly reasonable and necessary operating costs of the oil and gas wells located in the Agreed Riverbed based upon data provided by the Debtor to the Special Master.

21. On March 28, 2018, the State Court entered an order (the "March 2018 Order") providing the Special Master sole control over the Prepetition Royalty Account and the Prepetition Disputed Working Interest Account. Pursuant to the March 2018 Order, the State Court ordered the Debtor to cause the purchasers of oil, gas, condensate and liquid hydrocarbons from the Agreed Riverbed to deposit 36.75% of the proceeds directly into the Prepetition Disputed Working Interest Account and to deposit 21.5% of the proceeds directly into the Prepetition Royalty Account. Pursuant to the March 2018 Order, the State Court gave the Special Master the power, duty and authority to determine and pay to the Debtor (without order of the State Court) 49% of the reasonable and necessary monthly operating costs from the Prepetition Disputed Working Interest Account, to pay 36.75% of the monthly severance taxes from the Prepetition Disputed Working Interest Account, and to pay 21.5% of the monthly severance taxes from the Prepetition Royalty Account.

22. Pursuant to the March 2018 Order, the Special Master may determine and pay, without order of the State Court, the reasonable and necessary compensation for his work and that of his consultants.

### A.   The Debtor's Prepetition Capital Structure

23.   On July 13, 2017, the Debtor entered into a loan agreement (together with all related loan documents, the "Prepetition Loan Facility") with Washington Federal, National Association ("Washington Federal") for a secured revolving line of credit (the "Revolver Loan") which matures July 13, 2020.

24.   Under the Prepetition Loan Facility, the total revolving line of credit is $5,000,000.00.   The Debtor does not have access to the total $5,000,000 until Washington Federal receives satisfactory evidence that the title issues regarding the Amended State Lease in the State Court Lawsuit have been resolved.

25.   Pursuant to the Loan Documents, the Revolver Loan bears annual interest equal to the sum of the prime rate plus one-fourth of one percent (.25%), rounded upward, to the next highest one-eighth of one percent; provided, however, that the interest rate payable on the revolving note shall never fall below a floor rate of four percent (4%) per annum and collateralized by mortgaged properties. As of the Petition Date, the Debtor has a principal balance outstanding on the Prepetition Credit Facility in the amount of approximately $680,000.00.

26.   The Debtor is also a party to a loan with RNP, LLC ("RNP"), the owner of the Debtor.   As a result of the ongoing State Court Lawsuit, RNP had to fund operating expenses to keep the Debtor's business going.   As of the Petition Date, the outstanding amount owed to RNP is 242,500 plus interest.

27.   The Debtor uses trade credit in the ordinary course of its business.

### RELIEF REQUESTED

28.   The Debtor requests entry of an order substantially in the form attached hereto to authorize the Debtor obtain credit from RNP (in such capacity, the "DIP Lender") pursuant to the

Debtor-In-Possession Loan Agreement attached hereto as <u>Exhibit A</u> (the "<u>DIP Loan Agreement</u>").

29. The Debtor intends to use the proceeds of the DIP Loan in accordance with the budget attached hereto as <u>Exhibit B</u> (the "<u>Budget</u>"). As set forth in the DIP Loan Agreement, the total expenses incurred by the Debtor during any weekly period may vary by up to ten percent (10%) from the Budget and any unused amounts for any weekly period may roll forward and be available for future periods.

30. The Debtor requests that the advances made by the DIP Lender receive the following protections: (i) such claim will have priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (ii) such claim will be secured by a lien on property of the Debtor's estate that is not otherwise subject to a lien; and (ii) such claim shall be secured by a junior lien on property of the Debtor's estate that is subject to a lien.

### SUMMARY OF PRINCIPAL TERMS OF DIP FACILITY

31. Pursuant to Bankruptcy Rule 4001(c) and (d) and Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms of DIP Loan Agreement and the Interim Order:[4]

| Material Provision | Summary Description of Material Provision |
|---|---|
| **DIP Credit Agreement Parties** Fed. R. Bankr. P. 4001(c)(1)(B) | <u>Borrower</u>: Ponderosa-State Energy, LLC <br> <u>DIP Lender</u>: RNP, LLC |
| **Amount of Borrowing** Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(1) | Commitment up to $100,000 on an interim basis plus an additional $200,000 on a final basis plus an additional $200,000 if requested by the Debtor and approved by the DIP Lender. |

---

[4] This summary is qualified, in its entirety by the provisions of the DIP Loan Agreement.

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Purpose/Use of Funds**<br>Fed. R. Bankr. P. 4001(c)(1)(B);<br>Local Rule 4001-2(8),(9) | The proceeds shall be used (i) to pay for the costs of working over certain wells that are covered by the Amended State Lease; (ii) to pay the fees, costs and expenses of the Debtor's professionals; and (iii) to pay the fees for the U.S. Trustee including any applicable interest. |
| **Maturity Date**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The amounts owed to DIP Lender will become immediately due and owing on the date that is twelve (12) months from the Petition Date. |
| **Interest Rate**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Twelve percent (12%) per annum compounded monthly. |
| **Fees and Costs**<br>Fed. R. Bankr. P. 4001(c)(1)(B);<br>Local Rule 4001-2(3),(16) | No fees. The Debtor is responsible for the DIP Lender's out-of-pocket costs incurred in in connection with the preparation of loan documents, the making of the DIP Loan and the enforcement and administration of the DIP Loan, all subject to the Budget. The Debtor may pay such costs of the DIP Lender up to the amounts in the Budget without further review by the Court; provided that copies of any such invoices provided to the Debtor shall be provided contemporaneously to the U.S. Trustee and counsel to any official committee (if any). For the avoidance of doubt, the DIP Lender's out-of-pocket costs must be reasonable. Although the U.S. Trustee fee guidelines do not specifically apply, the DIP Lender's professionals shall be required to submit time and expense detail with the invoices, and any further information or back up documentation required to determine the reasonableness of the request. |
| **Events of Default**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii)<br>Local Rule 4001-2(10) | The loans become immediately due and owing upon any of the following: (i) failure of make any payment when due, (ii) the Chapter 11 Case converts to a case under chapter 7 of the Bankruptcy Code, (iii) a chapter 11 trustee is appointed in the Chapter 11 Case, (iv) sixty (60) days following the confirmation of a chapter 11 plan in the Chapter 11 Case, or (v) the principal asset of the Debtor is sold. |
| **Liens and Priorities**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii) | The DIP Lender's claim shall be secured by a lien as follows:<br><br>1. a first lien in all the Debtor's assets, including all real and personal property, whether now owned or hereafter acquired, that is not otherwise secured by a lien pursuant to Section 364(c)(2) of the Bankruptcy Code, and<br>2. a junior lien in all the Debtor's assets, including all real and personal property, whether now owned or hereafter |

| Material Provision | Summary Description of Material Provision |
|---|---|
|  | acquired, that is secured by a valid, perfected, non-avoidable lien, as of the Debtor's Petition Date, pursuant to Section 364(c)(3) of the Bankruptcy Code.<br><br>Provided, however, that excluded from any such liens are the Debtor's Chapter 5 avoidance actions and the proceeds thereof. |
| **Super-Priority Claim**<br>Local Rule 4001-2(5) | Subject to the Carve-Out (defined below), the DIP Lender's claim under the DIP Loan will have superpriority status pursuant to Section 364(c)(1) of the Bankruptcy Code. |
| **Conditions Precedent to All Drawing**<br>Fed. R. Bankr. P. 4001(c)(1)(B);<br>Local Rule 4001-2(1) | The Bankruptcy Court must approve the facility. The draws must be for expenses set forth in the Budget. |
| **Carve-Out**<br>Local Rule 4001-2(5) | "Carve-Out" means an amount equal to the sum of (i) fees and expenses incurred by bankruptcy professionals whose retention has been (A) approved by the Bankruptcy Court which are unpaid as of the delivery of a written notice of default and (B) provided for the in the Budget; (ii) fees and expenses in an amount not to exceed $65,000 incurred from and after the delivery of the Default Notice (defined in the DIP Loan) by bankruptcy professionals whose retention has been approved by the Bankruptcy Court plus $10,000 for chapter 7 costs if the case is converted to a chapter 7; and (iii) fees pursuant to 28 U.S.C.§ 1930 or to the clerk of the Bankruptcy Court, together with interest, if any, pursuant to 31 U.S.C. § 3717. |

**BASIS FOR RELIEF**

32. Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured basis. Specifically, section 364(c) of the Bankruptcy Code states that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code; secured by

a lien on property of the estate that is not otherwise subject to a lien; or secured by a junior lien on property of the estate that is subject to a lien.

33.   Thus, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain adequate unsecured credit, and the proposed borrowing is in the best interests of its estate.  *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (stating that, with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties").

34.   The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense."  *See Ames Dep't Stores,* 115 B.R. at 37–39 (holding that a debtor must show it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

35.   The DIP Lender has offered to make a postpetition secured loan to the Debtor up to the total principal sum of $500,000.00 ($100,000.00 will be immediately available upon entry of an interim order, an additional $200,000.00 will be available upon entry of a final order, and an additional $200,000.00 will be available at the Debtor's request, in the DIP Lender's sole discretion) will be to be used for the purpose of funding capital expenditures in connection with the Debtor's property, paying the Debtor's professional fees and paying the U.S. Trustee fees in the Chapter 11 Case.

36.   The Debtor needs access to this draw facility to fund capital expenses in connection with the Debtor's property.  Specifically, the Debtor will do workovers on certain of its oil and gas wells to resume production of oil and gas on such wells.  Without incurring these

expenses, the Debtor risks having production of oil and gas stop which in turn will result in a termination of the Amended State Lease and a loss of the Debtor's principal asset.

37. The Debtor also needs access to this draw facility to ensure that there are funds available to pay for the Debtor's professional fees and the U.S. Trustee fees in the Chapter 11 Case. The services of the Debtor's professionals are vital to the continued administration of the Chapter 11 Case. The payment of the U.S. Trustee fees is necessary for the administrative of the Chapter 11 Case.

38. On information and belief, the Debtor cannot find unsecured credit to fund these costs of the Chapter 11 Case other than the DIP Lender. As described in the Sands Declaration, the Debtor's interest in its assets is currently in dispute. Accordingly, it is reasonable that no other lender would extend postpetition financing to the Debtor in connection with this Chapter 11 Case on terms substantially similar to or better than those offered by the DIP Lender.

39. The Debtor contends that entry of an order approving financing is in the best interest of the Debtor's stakeholders, creditors and other parties in interest.

## EMERGENCY INTERIM RELIEF

40. Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides and provides that the Court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the Motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

41. As described in the Sands Declaration, the Debtor has an immediate postpetition need to access the funds provided by the DIP Loan Agreement. The Debtor cannot maintain the

value of its property during the pendency of its Chapter 11 Case without access to cash as set forth in the Budget and therefore the Debtor's estate would suffer immediate and irreparable harm to the detriment of all creditors and other parties-in-interest without access to funds.

42. The Debtor, therefore, seeks immediate authority to access funds in the amount of $100,000 under the DIP Loan Agreement on an interim basis and as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to its estate pending the final hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c).  Accordingly, to the extent the Debtor requires postpetition financing, the Debtor respectfully submits it has satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and relief on an interim basis.

## REQUEST FOR FINAL HEARING

43. Pursuant to Bankruptcy Rule 4001(c)(2), the Court may commence a final hearing on a motion for authority to obtain credit no earlier than fourteen (14) days after service of the motion.  The Debtor requests the Court set a date for the final hearing as soon as practicable and fix the date and time prior to the final hearing for parties to file objections to the relief requested by this Motion.

## WAVIER OF BANKRUPTCY RULES REGARDING
## NOTICE OF STAY OF AN ORDER

44. To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 7062, 9014 or otherwise for all of the reasons described above.

## NO PRIOR REQUEST

45.     No prior motion for the relief sought herein has been made in this or any other Court.

## NOTICE

46.     Notice of this Motion has been provided to: (i) the U.S. Trustee for Region 2; (ii) each creditor on the list filed pursuant to Bankruptcy Rule 1007(d); (iii) those persons who have requested service pursuant to Bankruptcy Rule 2002; (iv) Washington Federal; (v) the Special Master; (vi) counsel to the TX Plaintiffs; and (vii) counsel to the proposed DIP Lender. The Debtor submits that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter an order substantially in the form of the proposed order attached hereto and grant any other relief that is just and proper.

Dated: New York, New York
        September 18, 2019

Respectfully submitted,

DIAMOND MCCARTHY LLP

*/s/ Charles M. Rubio*
Charles M. Rubio
Sheryl P. Giugliano
295 Madison Ave., 27th Fl.
New York, NY 10017
Tel: (212) 430-5400
crubio@diamondmccarthy.com
sgiugliano@diamondmccarthy.com

*Proposed Counsel to*
*Ponderosa-State Energy, LLC*