UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:

PONDEROSA-STATE ENERGY, LLC          Case No. 19-13011 (JLG)

    Debtor.                                   Chapter 11

--------------------------------------------------------x

**SUPPLEMENTAL DECLARATION OF RICHARD SANDS
UNDER LOCAL RULE 1007-2 AND LOCAL RULE 9077-1
IN FURTHER SUPPORT OF CERTAIN "FIRST DAY" MOTIONS**

I, RICHARD SANDS, declare pursuant to 28 U.S.C. § 1746 as follows:

1. On September 18, 2019 (the "Petition Date"), Ponderosa-State Energy, LLC, the above-captioned debtor (the "Debtor"), filed a voluntary petition for relief under chapter 11, title 11, United States Code (the "Bankruptcy Code") in this Court.

2. On the Petition Date, the Debtor filed the *Declaration of Richard Sands Under Local Rule 1007-2 and Local Rule 9077-1 in Support of Certain "First Day" Motions* [ECF 2] (the "Initial Sands Declaration")[1].

3. I submit this supplemental declaration (a) to explain the Debtor's relationship with Molori Energy, Inc. ("Molori"), (b) in further support of the emergency relief requested in the Cash Collateral Motion and the DIP Financing in order to provide additional information about the Debtor's cash needs in the first few weeks of the Debtor's chapter 11 case, and (c) in order to provide additional information about how the Debtor's strategy in this chapter 11 case does not merely transplant the State Court Lawsuit with respect to the Debtor's chapter 11 case.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Initial Sands Declaration.

**Relationship with Molori**

4. Starting on or about 2015, I have had business dealings with Molori through several companies that I own and control directly or indirectly.

5. On June 23, 2015, Signal Drilling commenced the State Court Lawsuit.

6. On May 6, 2016, I caused Ponderosa Energy, LLC ("PE") to enter into an Amended and Restated Working Interest Assignment Agreement (the "Molori Working Interest Assignment Agreement"). The Molori Working Interest Assignment Agreement contemplated a closing of a certain twenty-five percent (25%) working interest and proportionate net revenue interest in certain oil and gas properties upon the satisfaction of certain conditions described in the Molori Working Interest Assignment Agreement. A true and correct copy of the Molori Working Interest Assignment is attached hereto as Exhibit A.

7. On or about June 2, 2016, but effective April 30, 2016, I caused PE to enter into a Deed of Assignment of Working Interest (the "Molori Deed of Assignment") whereby PE assigned Molori a twenty-five percent (25%) working interest and proportionate net revenue interest in certain oil and gas wells. A true and correct copy of the Molori Deed of Assignment is attached hereto as Exhibit B.

8. On or about February 22, 2017, I caused PE to provide Molori's accountants Dale Matheson Carr-Hilton Labonte LLP a letter ("February 2017 Accountant Letter") acknowledging certain financial information related to the Molori Deed of Assignment. A true and correct copy of the February 2017 Accountant Letter is attached hereto as Exhibit C.

9. On December 5, 2017, PE filed a voluntary petition under chapter 11 of the Bankruptcy Code before this Court, Case No. 17-13484 (SHL).

10. In order to help Molori, a publicly traded company in Canada, with potential bad press from holding oil and gas interests in PE which just filed for bankruptcy protection, I arranged for a trade of Molori's interests in PE for oil and gas interests held by another company I own and control called SB Energy I, LLC. Specifically, I caused SB Energy I, LLC to assign to Molori a seventy-five percent (75%) working interest and proportionate net profits interests in certain wells known as the Thompson wells (the "Thompson Assignment"). The Thompson wells are part of a geological formation known as the "Red Cave" (the "Red Cave Interest"). A true and correct copy of the Thompson Assignment is attached hereto as Exhibit D.

11. On April 25, 2018, Molori issued a press release confirming the trade for the Red Cave Interests (the "Molori Press Release"). The Molori Press Release titled "Molori Energy Doubles Down on Red Cave Oil Play" provides in relevant part that "[Molori] has completed a trade with Ponderosa Energy, LLC of certain marginally-productive leases it shares with Ponderosa in Hutchinson County, Texas. As a result of the transaction, Molori will now have broad operatorship and hold 100% 'operated' interests in all of its Red Cave oil and gas acreage in nearby Moore County, Texas." A true and correct copy of the Molori Press Release is attached hereto as Exhibit E. Accordingly, Molori acknowledged and admitted that it traded the interests it received in the Molori Deed of Assignment for the Red Cave Interests.

12. Even if the trade is determined to be ineffective and Molori continues to retain an interest in the Molori Deed of Assignment, Molori's interests are limited to the wells set forth in the Molori Deed of Assignment. The oil and gas leases comprising the Amended State Lease are identified by the Texas Railroad Commission with the following numbers: 01671, 02378 and 04274. As set forth in the Molori Deed Assignment, the only wells that are part of these oil and gas leases that comprise the Amended State Lease are B26 (4274) and B9 (1671). B26 (4274) is

a non-producing well. B9 (1671) is a plugged well. Accordingly, even based on the Molori Deed of Assignment, Molori does not have any interest in any producing wells and therefore is not entitled to any distributions.

13. In the State Court Lawsuit, the Debtor requested authority from the State Court to enter into a loan with Washington Federal. On July 17, 2017, the State Court entered an order authorizing the Debtor to enter into a loan Washington Federal (the "Order Granting Approval For Loan"). Pursuant to the Order Granting Approval for Loan, the State Court protected the interests of the TX Plaintiffs by providing the following in relevant part: "[T]he loan and loan documents executed by Ponderosa-State Energy, LLC . . . shall not adversely affect, or attach to, any interest that Signal Drilling, Inc. Jaten Oil Company, or Riparia, LC may own or otherwise by entitled to, as may be determined upon a final judgment in this case." The Order Granting Approval for Loan does not provide any protections for Molori. A true and correct copy of the Order Granting Approval for Loan is attached hereto as Exhibit F.

14. On March 28, 2018, the State Court entered an order ("March 2018 Order") providing, among other things, how funds are to be deposited into and released from the Disputed Working Interest Account and the reporting related to the Disputed Working Interest Account. Molori did not receive any protections from the State Court in the March 2018 Order. Molori did not receive any contingent rights to the Disputed Working Interest Account nor did it receive any right to reporting related to the Disputed Working Interest Account. A true and correct copy of the March 2018 Order is attached hereto as Exhibit G.

**Emergency Cash Needs Before Final Orders**

15. In the Initial Declaration, I stated that during the first 30 days of the Debtor's case, I expected the Debtor's business to make approximately $40,000 in revenue from operations (such

amount to be divided among the Debtor and the disputed reserve accounts).[2] I also stated that I expected the Debtor to use approximately $88,000 in expenses (not including chapter 11 expenses), including $50,000 in expenses for well workovers to restore production from inactive wells.

16. It may appear, without further information, that by delaying use of the $50,000 for well workovers the Debtor should not require post-petition credit in the first few weeks of the case ($40,000 in revenue less $38,000 in expenses), but that is an oversimplification of the facts and circumstances.

17. For the reasons set forth below, the Debtor has an immediate and urgent need to use cash collateral and for access to post-petition credit in order to satisfy its operating expenses for the first 30 days of the Debtor's bankruptcy case. Even without using $50,000 in expenses for well workovers in the first 30 days of the Debtor's case, the Debtor is not on its own, without the use of cash collateral or access to post-petition credit, able to satisfy on a timely basis its essential operating expenses.

18. The entirety of the $40,000 in revenue expected from operations in the first 30 days of the case will not be available for the Debtor to use to pay operating expenses. Rather, 49% of 75% of the Debtor's revenues must be reserved and cannot be used to fund operations.

19. Second, even before the Petition Date, it was typical for the Debtor to require advances from RNP or Ponderosa TX Operating in order to meet monthly expenses, beyond its use of cash collateral. As a result of the ongoing State Court Lawsuit, the appointment of the Special Master, and the related funding delays, the Debtor has not had access to sufficient funding

---

[2] Initial Declaration, ¶ 14

from net proceeds to cover all its operating expenses. As of the Petition Date, the outstanding amount owed to RNP is $242,500 plus interest.

20. Now that the chapter 11 case has commenced, Washington Federal has agreed to allow the Debtor to use cash collateral subject to a budget, but that is not enough, even with a portion of the expected revenue described above. The Debtor has no cash as of the date of this Supplemental Declaration, and requires immediate access to funds in order to pay necessary expenses in order to ensure that the Debtor's wells continue producing. If the Debtor's wells stop producing, the Debtor's Amended State Lease with the State of Texas could lapse by its terms because they will not be "held by production" (an industry term which means that the Amended State Lease only belongs to the Debtor as long as the wells produce, otherwise the Amended State Lease will lapse if production is not resumed within a certain specified time).

21. Since the Petition Date, four of the seven operating wells have stopped working and are in need of immediate repair. The service provider the Debtor needs to fix the wells is owed $40,000 as of the Petition Date, and will not work unless it is prepaid. At a minimum, the Debtor needs to pay that service provider $19,000 in order to have the wells repaired.

22. Also, the Debtor needs to pay its pumper. The pumper is paid $6,000 per month, in semi-monthly payments. It is an absolute necessity to have a pumper on site, because if there are any leaks, electrical fires, storms or other hazardous situations, they cannot be allowed to continue for any extended period of time. Accordingly, a pumper must be on site every day, to check all 65 of the Debtor's wells.

23. RNP is willing to extend post-petition credit to allow the Debtor to meet monthly shortfalls until the Debtor is able to complete well workovers to restore production from inactive wells, but only on a secured basis. The Debtor has an immediate need to access the funds provided

by RNP, in order to pay immediate, necessary operating expenses including those needed to pay the service provider that will repair the wells and the Debtor's pumper.

24. Ponderosa TX Operating is the Debtor's operator of record for all of the Debtor's oil and gas properties. Ponderosa TX Operating also provides managerial, technical, professional and administrative services to the Debtor.

25. It is in that capacity that Ponderosa TX Operating will pay invoices related to performing those services for the Debtor's oil and gas properties, and then seek reimbursement from the Debtor. If the Debtor does not have access to cash collateral and post-petition credit, it will not be able to reimburse Ponderosa TX Operating for those advances, and Ponderosa TX Operating will incur daily post-petition administrative expense claims against the Debtor's estate, because Ponderosa TX Operating must pay those expenses under any circumstance.

**Claims Against Texas in the State Court Lawsuit Will Remain in Texas**

26. The Debtor is caught in the middle of a dispute between the TX Plaintiffs and the State of Texas related to a governmental takings claim. If the merits of the State Court Lawsuit could be heard with respect to the TX Plaintiffs' claims against the Debtor, then the Debtor's title with the State of Texas as lessor under the Amended State Lease would have, in my opinion, been validated and the Debtor's ability to service its obligations restored.

27. The Debtor is not attempting to transplant the State Court Lawsuit in its entirety to New York in order to be more quickly heard and have the issues raised before the State Court determined by this Court. Rather, the Debtor seeks to extract only those claims asserted against the Debtor which are clouding title to the Debtor's property, and have those claims estimated by this Court. The TX Plaintiffs' claims asserted against the State of Texas, which are causing delay and hampering the Debtor's ability to maximize the value of its assets for the benefit of all interested parties, can remain before the State Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2019

_____
Richard Sands